Kevin P. Roddy, Esq.
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:   (732) 726-6686
Email: kroddy@wilentz.com

William W. Palmer, Esq.
(*Pro Hac Vice* Application To Be Filed)
PALMER LAW GROUP, PLC
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Facsimile:  (916) 972-0877
Email: wpalmer@palmercorp.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LISA SALVATO and on behalf of herself and other persons similarly situated,<br><br>      Plaintiff,<br><br>      v.<br><br>KEVIN D. WALSH, in his official capacity as ADMINISTRATOR OF THE STATE OF NEW JERSEY,<br><br>      Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

#12380708.1

Plaintiff, Lisa Salvato (hereinafter "Plaintiff"), on behalf of herself and the members of the proposed Class described herein, for her Class Action Complaint for Declaratory and Injunctive Relief ("Complaint") against Defendant, Kevin D. Walsh, Administrator of the State of New Jersey Unclaimed Property ("Defendant" or "Administrator"), hereby alleges as follows:

## JURISDICTION AND VENUE

1.      This lawsuit is brought pursuant to the following provisions of the United States Constitution: (a) Fourteenth Amendment, Section 1 (Due Process Clause), and (b) Fifth Amendment, Article I, Section 10 (Takings Clause).  This action is also brought pursuant to 42 U.S.C. § 1983.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

2.      A substantial part of the events or omissions giving rise to the claims here at issue occurred in this District.  A substantial portion, if not all, of the property seized by the Administrator is situated herein.  Therefore, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2).

## PARTIES

3.      Plaintiff is an individual investor and resident of New Jersey who was issued shares of Boston Life Sciences ("BLSI") stock.  Plaintiff brings this action on behalf of herself and other injured citizens of the State of New Jersey.

4.     Defendant is responsible for the enforcement and administration of the Act.  Defendant's headquarters is located at 20 West State Street, Trenton, New Jersey.

## GENERAL ALLEGATIONS

### A.     Background Facts

5.     This proposed class action challenges the constitutionality of the New Jersey Uniform Disposition of Unclaimed Property Act, N.J.S.A. § 46:30B-1, *et seq*. (the "Act"), which requires that banking organizations and other entities holding so-called "abandoned" property transfer it to the New Jersey State Administrator Unclaimed Property Administration ("UPA").   Such property includes dormant savings accounts, uncashed payroll checks, unredeemed customer or vendor credits, unused gift cards or gift certificates, and inactive stock and bond accounts.

6.     Currently, the UPA holds over an estimated ***$4 billion***[1] in "unclaimed" property.  This property is owned by such purportedly "unknown" persons as the singer George Clinton, the actor Meryl Streep, the singer Taylor Swift, the actor Danny Devito, New Jersey Governor Phil Murphy, and the former President of the United States Donald J. Trump.  Based on information and belief,

---

[1]     New Jersey law only allows for the release of the property owner's name and address.  Therefore, just as it is for the private owners, it is difficult or impossible for the public to determine how much unclaimed property, at any time, is in the custody of the State of New Jersey.

certain property is not listed in the government indexes and property valued below $100.00 is neither listed, nor do the owners receive any notice whatsoever.  *See* N.J.S.A. § 46:30B-53.

7.    The Act declares that "[w]hen property presumed abandoned generally.  Except as otherwise provided by this chapter, all property, including any income or increment derived therefrom, less any lawful charges, whether located in this State or another state, that is held, issued, owing in the ordinary course of a holder's business and has remained unclaimed by the owner for more than three years after it became payable or distributable is presumed abandoned." N.J.S.A. § 46:30B-7.  However, the Act does not require banks and other financial services institutions holding "abandoned" property of less than $50.00 in value to provide any notice to its rightful owner before transferring it to the UPA.  N.J.S.A. § 46:30B-50.   Such property may be transferred to the UPA without any individualized notice or any published notice to its rightful owners at all.  Based on information and belief, Plaintiff's shares of stock were worth significantly more than $100.00, but were valued below $50.00 so that Plaintiff received no notice of any kind prior to seizure of the shares and there is no record of the shares. Defendant violated N.J.S.A. § 46:30B-51 because the shares of stock were worth more than $100.00 and Defendant was, therefore, required to provide direct mail

and publication notice of general circulation to Plaintiff in a newspaper and the Defendant did not do so.

8.     Moreover, New Jersey uses a short, *three*-year "dormancy" period to determine whether a bank account may be deemed dormant and, therefore, "abandoned."  Thus, if an account is inactive for three years – for example, if a customer uses a savings account as a "rainy day" fund and makes no deposits or withdrawals for three years – the account can be listed as "abandoned."

9.     After property is transferred to the UPA, the Act continues to deny owners any individualized notice, even after they have been deprived of their property.  Instead, UPA operates a searchable Internet website that property owners may visit, if they are aware of it.  In theory, claimants may submit claim forms seeking the return of certain types of property by mail or online: https://unclaimedfunds.nj.gov/app/claim-search.

10.     However, it is difficult or impossible for owners to reclaim their property because (a) the unsearchable public website hides the identifying information from the owner; (b) there is no legal claims process; and (c) Defendant fails to verify owner information with the other State of New Jersey databases, such as the Department of Motor Vehicles or voter registration lists.  This is especially true if the property is listed with last name first or if the name is misspelled or abbreviated or if a nickname is used (such as "Bill" for "William" or

4

"Dave" for "David"), or if the property is listed by the name of the institution holding it, rather than the individual owner.  Further, the UPA may reject claims if, for example, it deems their documentation inadequate based on the unpublished or verbal claims process.  Moreover, with no notice of any kind, many individuals are simply unaware that their property has been transferred to the UPA or are unaware of the procedure for seeking its return.  Accordingly, property owners are highly unlikely to avail themselves of this procedure and, in fact, only a small portion of seized property is ever returned.  In addition, owners of unclaimed property are not entitled to receive interest.  N.J.S.A. § 46:30B-79.

11.    In 2016, two Justices of the U.S. Supreme Court – Justice Alito, joined by Justice Thomas – expressed constitutional concern about state abandoned property laws, in a separate opinion concurring in the denial of *certiorari* in a case presenting the question whether "California law provides property owners with constitutionally sufficient notice before escheating their financial assets." *Taylor v. Yee*, ___ U.S. ___, 136 S. Ct. 929, 929 (2016).  These Justices explained that "[t]he Due Process Clause requires States to give adequate notice before seizing private property. When a State is required to give notice, it must do so through processes 'reasonably calculated' to reach the interested party – here, the property owner." *Id.* (citation omitted).

5

12.    In that case, Justices Alito and Thomas explained that because the seizure of private property is no small thing, notification procedures may not be empty rituals:  "[P]rocess which is a mere gesture is not due process.'  Whether the means and methods employed by a State to notify owners of a pending escheat meet the constitutional floor is an important question." *Id.* (citations omitted).  The Justices noted that, "[i]n recent years, States have shortened the periods during which property must lie dormant before being labeled abandoned and subject to seizure." *Id.* at 930.  They cited New York, in particular, as an example, and then observed that it recently shortened its dormancy period from as long as 15 years to merely three years.  *Id.*  "This trend—combining shortened escheat periods with minimal notification procedures—raises important due process concerns.  As advances in technology make it easier and easier to identify and locate property owners, many States appear to be doing less and less to meet their constitutional obligation to provide adequate notice before escheating private property. Cash-strapped States undoubtedly have a real interest in taking advantage of truly abandoned property to shore up state budgets. But they also have an obligation to return property when its owner can be located. To do that, States must employ notification procedures designed to provide the pre-escheat notice the Constitution requires."  *Id.*  These Justices concluded that "the constitutionality of current state escheat laws is a question that may merit review in a future case."  *Id.*

13.     New Jersey is generally considered to have one of the most aggressive abandoned property statutes in the nation.   The Council on State Taxation ("COST") graded all 50 states based on the aggressiveness of their abandoned property laws.   New Jersey, along with California and Louisiana, received the COST's *lowest* grade: a "D."[2]

14.     In this case, Plaintiff received no notice before her property was seized by the State of New Jersey and transferred to the UPA.   Plaintiff was subsequently unsuccessful in seeking return of her property pursuant to the post-deprivation procedures.

15.     The loss of her property in violation of her constitutional rights has caused irreparable harm to Plaintiff.  Plaintiff purchased 200 shares of BLSI stock on or about December 28, 2001, conjointly with her mother, Viola Salvato.  Viola Salvato passed away on or about July 10, 2002, and Plaintiff processed the paperwork to transfer the stock solely into her name.  Plaintiff learned that the stock was "escheated" to the Administrator's office in 2010 without any notice to Plaintiff; however, for more than nine (9) years, Defendant's office has been unable to locate the missing property.  Plaintiff continued to receive investor e-

---

[2]     https://www.cost.org/globalassets/cost/state-tax-resources-pdf-pages/cost-studies-articles-reports/cost-scorecard--the-best-and-worst-of-state-unclaimed-property-laws-october-2013.pdf.

mail messages from the holder as late as May 28, 2021, two (2) years *after* the stock was purportedly "escheated."

16.    On or about September 27, 2019, Plaintiff received a phone call from the Defendant's office asking to speak with Viola Salvato.  Defendant's office explained to Plaintiff that they indeed had the escheated stock but that it was only valued at $3.00 per share.  Plaintiff was advised that all forty (40) shares, the total, were worth "around $3.00."

17.    Plaintiff discovered for the first time that 40 shares of Alseres Pharmaceuticals (**"ALSE"**) had been escheated to New Jersey Unclaimed Property on or about May 19, 2020, without any prior statutory or constitutional notice to Plaintiff.   For years, Defendant repeatedly denied that the agency had the Plaintiff's property.  On May 19, 2020, the stock market reflected a high value of $60,000 as the value of Plaintiff's forty (40) shares of ALSE stock.  Plaintiff discovered that Defendant sold the shares on February 8, 2013, on a day when the value fluctuated between $300 to $500 per share so New Jersey Unclaimed Property received a high of $20,000 or a low of $12,000.

18.    In response to Plaintiff's written inquiry, Defendant stated that it does not have the money from the unauthorized ALSE stock transfer and the Defendant's unconstitutional, unnoticed sale of the 40 shares of ALSE stock. Plaintiff did not learn this information from Defendant, but only learned it after she

filed a complaint with the U.S. Securities & Exchange Commission against the transfer company, Continental Transfer.

19.    Accordingly, in this proposed class action Plaintiff seeks declaratory and injunctive relief against Defendant to remedy constitutional defects in the Act.

**B.**    **Statutory Background**

20.    New Jersey's Act departs from the historic function of abandoned property laws.  Traditionally, abandoned property or "escheatment" statutory schemes applied to real property and tangible personal property belonging to persons who died intestate or disappeared, where there was no descendent, relative, or other valid claimant to the estate.  In these situations, the property truly was abandoned and ownerless (*bona vacantia*).

21.    However, the Act is very different from traditional statutes.  Instead of being limited to property owned by persons who have died intestate or disappeared, the statute applies to ***any*** property meeting the technical definition of "abandonment."  Rather than protecting the rights of the "true owners," the Act represents a new form of escheatment that views unclaimed property law as a revenue generator for the State of New Jersey.

22.    It was not until the mid-Twentieth Century that states such as New Jersey began to expand unclaimed property laws to include certain types of intangible property including, in particular, unclaimed bank deposits.  State

governments soon realized that unclaimed intangible property, after it was remitted to the states, was often never claimed by the owner and, thus, could represent a significant source of revenue for the state.

23.     Starting in the late 1990's and continuing into the early 2000's, the states began to dramatically increase their enforcement efforts.  This surge in audit activity was in large part due to the proliferation of the use of private contract audit firms that are compensated by the states on a contingent-fee basis – typically, 10 to 15 percent of the amount of any unclaimed property that is identified in the audit. Such a fee structure provides a profit incentive to such firms to take aggressive positions in these audits.  Further, these contingent-fee audit firms are often staffed by former accountants and consultants with far greater expertise in unclaimed property matters than their client states, which led many states to defer almost entirely to the positions taken by these firms in audits.

24.     Unclaimed property audits are replete with examples of the contract audit firms essentially dictating policy to states, which lack the knowledge or expertise to know when these audit firms are overreaching.  The use of contingent fee audits (which of course creates financial incentives for larger assessments) is also inconsistent with the primary purpose of unclaimed property laws, which is to return property that is indisputably owed to another person.

25.    In short, the Act, along with unclaimed property laws in other states, has been trending in the wrong direction for over thirty years, because such laws have been greatly expanded in unconstitutional ways for the purpose of generating revenue for states, at the expense of both owners and putative holders of unclaimed property.

26.    The Act does not use the traditional understanding of "abandonment" – *i.e.*, the knowing and voluntary relinquishment or renunciation of property rights. Instead, property is deemed to be "abandoned" under the Act according to dormancy thresholds specified in the statute.  As a general rule, property is presumed "abandoned" if it is dormant for one to five years (generally three years) with no activity by the owner.  *See*, *e.g*., N.J.S.A. §§ 46:30B-28.1 to 46:30B-45. This three-year rule applies to checks, certified checks, credit memos, dividends, money orders, savings accounts, non-governmental bonds, travelers checks, shares, bonds, commissions, and all other intangible property.

27.    The Act uses a three-year rule to determine whether a bank account is dormant, even though a typical person does not "forget" about his or her bank account after a mere three years.  Rather, such accounts are often left untouched for extended periods of time (*e.g.*, "rainy-day" accounts).

28.    In another escheat case, Judge Richard Posner of the Seventh Circuit Court of Appeals described a three-year dormancy period for determining

abandonment as "a period so short as to present a serious question whether it is consistent with the requirement in the Fourteenth Amendment that property not be taken without due process of law, implying adequate notice and opportunity to contest." *Cerajeski v. Zoeller*, 735 F.3d 577, 582 (7th Cir. 2013).

29.    In *Taylor v. Westly,* 488 F.3d 1197 (9th Cir. 2007), the Ninth Circuit Court of Appeals held that an injunction should be issued against California's Unclaimed Property law for violations of the U.S. Constitution similar to those alleged in this case.

30.    As part of the State's relentless campaign to fill its coffers with "abandoned" property, the Act contains strong penalties coercing holders of property, including banks and other entities, to report as much "abandoned" property as possible to the UPA.  Such entities are required, subject to severe penalties, to submit "holder reports" annually to the UPA listing all "abandoned" property they hold. Such reports must include details on the property as well as a remittance to the UPA of the escheated property.

31.    "Abandoned" property is transferred to the UPA, under the supervision of the Administrator, which acts as custodian of the property.  Holders of property (such as banks and utilities) are required to transfer cash via checks or electronic funds transfers.

32.     Property that is not claimed by its owners is escheated to the State and spent by the New Jersey State government.

33.     The State's voracious appetite for unclaimed property is reflected in its retention, as of fiscal year ("FY") 2020, of *$4 billion* in unclaimed funds.  New Jersey does not publish adequate descriptions of property, including the values, which are unavailable on the State's website.[3]

34.     Banking organizations holding purportedly "abandoned" property which is less than $50 in value are not required to provide any notice at all to rightful owners before transferring it to the UPA.  N.J.S.A. § 46:30B-50.

35.     Telephone calls or verbal contact with an owner does not prevent property from being deemed abandoned.  Nor does internal activity such as service charges, crediting of interest and dividends, automatic dividend reinvestment, and automatic withdrawals.

## CLASS ACTION ALLEGATIONS

36.     This is a proposed class action brought by Plaintiff pursuant to FED. R. CIV. P. 23(b)(1)(A) and 23(b)(2) on her own behalf and on behalf of all those similarly situated with respect to the operation and administration of the Act.  The proposed Class consists of all individuals owning purportedly "abandoned"

---

[3]      https://unclaimedfunds.nj.gov/app/claim-search.

property transferred to Defendant under color of the Act over the past ten (10) years without notice to the owners.

37.    Although the exact number, identity, and location of persons in the proposed Class is readily discernible based on the Defendant's own records, upon information and belief, the number of members in the proposed Class will be in excess of 1,000 persons.  Those persons in the Class are, therefore, so numerous that joinder of the entire proposed Class in impractical.

38.    There are questions of law and fact common to all members of the proposed Class, including whether Defendant complied with the constitutional requirements for the deprivation and taking of property.

39.    Plaintiff's claims are typical of those of the members of the proposed Class, who are subject to the same deprivations of their property and rights.  There is a well-defined community of interest in the questions of law and fact involved in this case.

40.    Plaintiff can adequately represent the interests of the members of the proposed Class.  She has no interests relevant to the lawsuit's subject matter antagonistic to the Class members.  The undersigned attorneys have experience in complex litigation, including class actions, involving issues identical or similar to those raised in this action.

41.    Because Defendant's duties to comply with the Constitution apply equally to each person in the proposed Class, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendant.

42.    Defendant's actions and threatened actions are depriving and will deprive Plaintiff and the members of the proposed Class of their constitutional rights on grounds generally applicable to all, thereby making appropriate declaratory, injunctive, and equitable relief and § 1983 claims with regard to the proposed Class as a whole.

43.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FIRST CLAIM FOR RELIEF

### (U.S. Const., Fourteenth Amendment, Section 1 - Due Process Clause; 42 U.S.C. § 1983)

44.    The allegations set forth above are incorporated into this claim by reference as though set forth in full.

45.    The Fourteenth Amendment, Section 1, of the United States Constitution provides, in part, "nor shall any State deprive any person of life, liberty, or property, without due process of law. . . ."  A claim alleging violation(s) of this federal right may be brought under 42 U.S.C. § 1983.

15

46.     The Administrator, under the color of law as provided by the Act, has violated (and continues to violate) Plaintiff's right to due process through the enforcement and administration of the Act, by depriving her of her property without due process.

47.     Plaintiff, as well as the owners of existing property, have a constitutionally protected property interest in the private property that they own and that is seized by the State of New Jersey under the processes described herein. Defendant deprived Plaintiff and property owners of their constitutionally protected property interests by seizing their property without providing notice and due process and by arbitrarily taking property from private companies and financial institutions referred to as "Holders" under the nomenclature of the Act without notice and even without requesting the rightful owner's name, even when it is readily available, when the property is worth less than $100.00.

48.     Unless the Administrator is restrained and enjoined from continuing to enforce and administer the Act in manner that violates Plaintiff's constitutional rights, he will continue to do so far into the foreseeable future.

49.     Plaintiff has no plain, speedy, adequate remedy at law; therefore, injunctive relief from this Court is the only means available to them to protect the rights guaranteed Plaintiff and the members of the Class by the Fourteenth Amendment's Due Process Clause.

## SECOND CLAIM FOR RELIEF

### (U.S. Const., Fifth Amendment - Takings Clause;
### 42 U.S.C. § 1983)

50.     The allegations set forth above are incorporated into this claim by reference as though set forth in full.

51.     The Fifth Amendment to the United States Constitution provides, in part, that "[n]o person shall . . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."   The Just Compensation requirement is a self-executing constitutional command.  It is also enforceable via an action brought pursuant to 42 U.S.C. § 1983.

52.     The Administrator, under the color of law as provided by the Act, has violated (and continues to violate) each Plaintiff's right under the Fifth Amendment through his enforcement and administration of the Act, by taking each Plaintiff's property without just compensation.

53.     The Administrator's above-described unlawful takings of private property substantially impaired Plaintiff's access, use, and enjoyment of said property for no valid public use or public purpose.

54.     Unless the Administrator is restrained and enjoined from continuing to enforce and administer the Act in manner that violates Plaintiff's constitutional rights, he will continue to do so far into the foreseeable future.

55.     Plaintiff has no plain, speedy, adequate remedy at law; therefore, injunctive relief from this Court is the only means available to her to protect the rights guaranteed Plaintiff and the members of the Class by the Fifth Amendment's takings clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.     Declaratory relief declaring that Defendant's enforcement and administration of the Act against Plaintiff and the members of the Class violate the Fifth and Fourteenth Amendments of the United States Constitution.

2.     Injunctive relief enjoining Defendant from enforcing or administering the Act against Plaintiff and the members of the Class.

3.     Injunctive relief requiring Defendant to return each Plaintiff's property and each Class member's property with substantive due process rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.

4.     An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

5.     Such other and further relief as this Court deems just and proper.

Respectfully Submitted,

DATED: June 17, 2021       WILENTZ, GOLDMAN & SPITZER, P.A.


By: /s/ Kevin P. Roddy
      KEVIN P. RODDY, ESQ.

90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:   (732) 726-6686
Email: kroddy@wilentz.com


DATED: June 17, 2021       PALMER LAW GROUP, a PLC


By: /s/ William W. Palmer
      WILLIAM W. PALMER, ESQ.
      (*Pro Hac Vice* Application To Be Filed))
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Facsimile:  (916) 972-0877
Email: wpalmer@palmercorp.com

Attorneys for Plaintiff

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

DATED: June 17, 2021            WILENTZ, GOLDMAN & SPITZER, P.A.

By: /s/ Kevin P. Roddy
     KEVIN P. RODDY, ESQ.

90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:   (732) 726-6686
Email: kroddy@wilentz.com

DATED: June 17, 2021            PALMER LAW GROUP, a PLC

By: /s/ William W. Palmer
     WILLIAM W. PALMER, ESQ.
     (*Pro Hac Vice* Application To Be Filed))
2443 Fair Oaks Boulevard, No. 545
Sacramento, CA 95825
Telephone: (916) 972-0761
Facsimile:  (916) 972-0877
Email: wpalmer@palmercorp.com

Attorneys for Plaintiff