*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LISA SALVATO, on behalf of herself and other persons similarly situated, | |
| Plaintiff, | Civil Action No. 21-12706 (FLW) |
| v. | OPINION |
| STEVEN HARRIS, in his official capacity as the Administrator of the State of New Jersey, | |
| Defendant. | |

**WOLFSON, Chief Judge:**

Plaintiff Lisa Salvato ("Plaintiff" or "Salvato") brought this putative class action against Defendant Steven Harris, in his official capacity as the New Jersey Unclaimed Property Administrator ("Defendant" or "Harris"), challenging Defendant's actions in connection with the escheatment and sale of stock owned by Plaintiff under the New Jersey Uniform Disposition of Unclaimed Property Act, N.J.S.A. § 46:30B-1, *et seq.* (the "Act" or "UPA"). Presently before the Court is a motion to dismiss filed by Defendant, arguing that the Eleventh Amendment of the U.S. Constitution bars Plaintiff's claims for damages and injunctive relief, Plaintiff lacks standing, the *Burford* abstention doctrine requires that this Court defer to the state administrative process, and Plaintiff fails to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

For the reasons that follow, Defendant's motion to dismiss is **GRANTED** in part and **DENIED** in part. Plaintiff's claim for violation of the Takings Clause of the Fifth Amendment under 42 U.S.C. § 1983 is dismissed without prejudice because the Complaint fails to allege exhaustion of the UPA's claim procedure. Plaintiff is given leave to amend her Complaint within

30 days of the Order accompanying this Opinion, so long as she can allege that she has exhausted all state just compensation procedures under the UPA. Defendant's motion to dismiss Plaintiff's claim for violation of her Fourteenth Amendment due process rights under 42 U.S.C. § 1983 is denied; however, the parties are directed to conduct expedited discovery within thirty days as it relates to the value of Plaintiff's property at the time of escheatment, the date of sale of the property, and the total sale price.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For the purposes of this motion, the Court takes as true all allegations of the Complaint. (*See*, *e.g.*, ECF No. 1 ("Compl.")).

Plaintiff alleges that on December 28, 2001, she and her mother, Viola Salvato, purchased 200 shares of Boston Life Sciences, Inc. ("BLSI") stock. (*Id.* at ¶ 15.) Later, BLSI exchanged its shares, five old shares for one new share, reducing Plaintiff's shares to forty, and also changed its name to Alseres Pharmaceuticals, Inc. (*Id.* at ¶¶ 15-17.)  According to Plaintiff, her mother died on or about July 10, 2002, at which time Salvato processed the paperwork necessary to transfer the Alseres stock solely into her name.  (*Id.* at ¶ 15.)

In 2010, however, despite this purported transfer of the stock, Alseres submitted an unclaimed property report to the State, which included the forty shares of stock held by Plaintiff and Viola Salvato as joint tenants.  (Certification of Steven Harris ("Harris Cert."), at Exh. A.) According to Plaintiff, she did not have knowledge of this report. (*Id.* at ¶¶ 15-17.) Rather, nine years later, in September 2019, Plaintiff alleges that she received a call from Defendant's office asking to speak with her deceased mother regarding the Alseres stock, which it valued at $3.00 per share. (*Id.* at ¶ 16.) According to Plaintiff, she discovered, for the first time, that Defendant had seized the stockholdings in or about 2010, before purportedly selling the stock on February 8,

2013, "on a day when the value fluctuated between $300 to $500 per share so New Jersey Unclaimed Property received a high of $20,000 or a low of $12,000." (*Id.* at ¶ 17.)[1]

On June 17, 2021, Plaintiff filed a class action complaint for declaratory and injunctive relief[2] against Kevin D. Walsh, the State Comptroller, asserting two causes of action: (1) violation of Plaintiff's Fourteenth Amendment due process rights under 42 U.S.C. § 1983 and (2) violation of the Takings Clause of the Fifth Amendment under 42 U.S.C. § 1983.  (Compl., ¶¶ 44-55.)[3]

Although certain portions of the Complaint could be construed as challenging the constitutionality of the Act itself, the balance of the allegations suggest that Plaintiff is solely challenging Defendant's actions, in his official capacity as the Unclaimed Property Administrator, as *ultra vires*.  In that regard, the Complaint alleges that "[t]he Administrator, under the color of law as provided by the Act, has violated (and continues to violate)" Plaintiff's right to due process and Plaintiff's property rights under the Fifth Amendment. (*Id.* at ¶¶ 46, 52.) More particularly, Plaintiff alleges that Defendant seized her property without providing adequate notice and without providing just compensation. (*Id.*) Plaintiff alleges that "[u]nless the Administrator is restrained and enjoined from continuing to enforce and administer the Act in [a] manner that violates Plaintiff's constitutional rights, he will continue to do so far into the foreseeable future." (*Id.* at ¶ 48.)

---

[1]   Defendant refutes the date of the sale, which he maintains actually occurred on February 5, 2013, as well as Plaintiff's explanation of historic stock prices associated with the sale.

[2]   Plaintiff's "Prayer for Relief" seeks a mixture of retroactive and prospective relief: (1) "[d]eclaratory relief declaring that Defendant's enforcement and administration of the Act against Plaintiff and the members of the Class violate the Fifth and Fourteenth Amendments of the United States Constitution," (2) "[i]njunctive relief enjoining Defendant from enforcing or administering the Act against Plaintiff and the members of the Class," and (3) "[i]njunctive relief requiring Defendant to return each Plaintiff's property and each Class member's property with substantive due process rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution."

[3]   One month after filing this action, Salvato amended the complaint, substituting Steven Harris as the sole defendant because the State Comptroller does not administer New Jersey's unclaimed property program.  (*See*, *e.g.*, Compl.)

Indeed, the Court's construction of the Complaint is further supported by Plaintiff's arguments in opposition to Defendant's motion to dismiss, wherein she repeatedly stresses the "actions" of Defendant and confirms that "[t]he question of whether the [Act] itself is constitutional is <u>not</u> before the Court." (Pl. Opp., 19) (emphases added.) Rather, Plaintiff emphasizes that "[her] central contention is that the Administrator's <u>actions</u> under color of the [Act]—like the seizure of property for which the Administrator has no authority under the [Act], and the refusal to provide notice or just compensation—are unconstitutional." (*Id.* at 19) (emphasis added.)

On September 27, 2021, Defendant filed the instant motion to dismiss. (ECF No. 12.)

## II.   <u>LEGAL STANDARD</u>

Courts undertake a three-part analysis when considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)) (alteration in original). Second, the court must accept as true all of the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quotation omitted). In doing so, the court is free to ignore legal conclusions or factually unsupported accusations that merely state, "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[M]ere restatements of the elements of [a] claim[ ] ... are not entitled to the assumption of truth." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) (alterations in original) (quotation omitted). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556

U.S. at 679).  "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

"Rule 12 prohibits the court from considering matters outside the pleadings in ruling on a motion to dismiss for failure to state a claim ... and a court's consideration of matters outside the pleadings converts the motion to a motion for summary judgment."  *Kimbugwe v. United States*, No. 12-7940, 2014 WL 6667959, at *3 (D.N.J. Nov. 24, 2014).  "[A]n exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."  *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (internal quotation marks omitted).  Notwithstanding these principles, courts may not consider allegations raised for the first time in a plaintiff's opposition to a motion to dismiss.  *See Pennsylvania ex rel Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

## III.   <u>DISCUSSION</u>

On this motion, Defendant raises four arguments for dismissal: (1) the Eleventh Amendment of the U.S. Constitution bars relief and the State of New Jersey, including its officers, is not subject to claims under 42 U.S.C. § 1983; (2) Plaintiff has no concrete injury, and therefore, she lacks standing; (3) the *Burford* abstention doctrine applies because the New Jersey statute provides both a clear administrative and state court path to review Salvato's unclaimed property claim; and (4) Plaintiff fails to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  The Court will address Defendant's procedural arguments first, before determining whether Plaintiff states a claim for relief.

At the outset, however, the Court finds it helpful to provide a brief overview of New Jersey's unclaimed property laws, including the UPA and the role of the Unclaimed Property Administration (the "Administration"). New Jersey, along with the other forty-nine states and the District of Columbia, have unclaimed property or escheat laws. *See Am. Express Travel Related Servs. Co. v. Sidamon–Eristoff*, 755 F. Supp. 2d 556, 567 (D.N.J. 2010), *aff'd*, 669 F.3d 374 (3d Cir. 2012). As this Court in *American Express Travel Related Services Co.* explained:

> The laws of most states are based upon a version of the Uniform Unclaimed Property Act ("UUPA"). The Court notes that the purpose of enacting these escheat laws is to provide for the safekeeping of abandoned property and then reunite the abandoned property with its owner. In the usual course, when property is deemed abandoned, the holder of most types of property is required to attempt to contact the owner, using the name and last known address, and if possible, return the property. If the attempt is unsuccessful, the holder turns over the abandoned property to the state and provides the state with the name and last known address of the owner.

755 F. Supp. 2d at 565. The Act defines "property" as "tangible property described in R.S.46:30B–45 or a fixed and certain interest in intangible property that is held, issued, or owed in the course of a holder's business, or by a government, government subdivision, agency, or instrumentality, and all income or increments therefrom[.]" N.J.S.A. 46:30B–6r. Property, among other things, includes "stock purchase, profit sharing, employee savings, supplemental unemployment insurance, or similar benefits." *Id.*

The Unclaimed Property Administration largely relies on self-reporting for remittance. By statute, when property is presumed abandoned, a holder of unclaimed property must annually report and remit unclaimed property to the Administration. N.J.S.A. 46:30B-6(g) (defining holder); N.J.S.A. 46:30B-46 (requiring reports); N.J.S.A. 46:30B-47 (form of the report); N.J.S.A. 46:30B-49 (reports due November 1 of each year). Interest in a business association, *i.e.*, stocks, is generally presumed abandoned after three years of certain triggering events, such as uncashed

dividends, undelivered stock certificates after a merger, or with automatic dividend reinvestment plans, after a second mailing is returned undeliverable. N.J.S.A. 46:30B-31; *see also* N.J.S.A. 46:30B-34. Specifically, N.J.S.A. 45:30B-31 provides that stocks are presumed abandoned (1) "three years after the earlier of the date of an unpresented instrument issued to pay interest or a dividend or other cash distribution, or the date of issue of an undelivered stock certificate issued as a stock dividend, split, or other distribution," or (2) "if a dividend or other distribution has not been paid on the stock or other interest for three consecutive years, or the stock or other interest is held pursuant to a plan that provides for the automatic reinvestment of dividends or other distributions, three years after the date of the second mailing of a statement of account or other notification or communication that was returned as undeliverable, or after the holder discontinued mailings to the apparent owner, whichever is earlier." That said, even if the abandonment period is met, property is not deemed abandoned if the holder has certain contact with the owner. N.J.S.A. 46:30B-33.

All unclaimed funds, including the proceeds from sold stocks, are held by the Treasurer, acting through the designated Unclaimed Property Administrator, and an owner may file a claim to property at any time. N.J.S.A. 46:30B-6(a); N.J.S.A. 46:30B-77. If validated, the claim is paid and the State must pay or deliver the property or amount received, or the net sale proceeds of any property sale (such as shares of stock). N.J.S.A. 46:30B-79. In addition, the State also pays interest "for the period during which those monies were in the custody of the administrator" at a rate fixed by the Unclaimed Property Administration (historically the interest paid on the State's cash management fund), permitting the money earned by the State to be returned to the owners. N.J.S.A. 46:30B-79 and -80.

A.     <u>Eleventh Amendment Immunity, Standing, and the *Burford* Abstention Doctrine</u>

       *1.  Eleventh Amendment Immunity*

Defendant first claims that he is entitled to immunity from Plaintiff's suit under the Eleventh Amendment to the U.S. Constitution. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. As developed, the Eleventh Amendment affords states and state agencies immunity from suits brought by citizens in federal court. *MCI Telecom. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 503–04 (3d Cir. 2001); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).

Defendant maintains that he is being sued in his official capacity as the New Jersey State Treasurer's designee to act as New Jersey's Unclaimed Property Administrator, and as such, he is an employee within the New Jersey Department of the Treasury.  (Def. Moving Br., 18-19.) According to Harris, as a state officer sued in his official capacity, any award against him is barred because it would be "paid from funds held by the Treasurer, the effective defendant, and real party-in-interest in this matter is the State of New Jersey." (*Id.* at 18.) In addition, Defendant claims that Salvato's prospective relief to compel pre-remittance notice by the State fails to meet the Eleventh Amendment's narrow exceptions. (*Id.* at 19-20.) According to Defendant, no congressional abrogation or state waiver exists, and prospective relief provides no redress for Salvato's concerns related to pre-remittance notice. (*Id.*) In that regard, "any property Salvato or the purported class allegedly owns has already been remitted to the [Unclaimed Property Administration], where a prospective injunction cannot help, while any request for payment of money or retroactive relief does not fit within the [Eleventh Amendment's] narrow exceptions." (*Id.*) (citing *N.J. Retail*

*Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 388 (3d Cir. 2012).  Finally, Defendant argues that the Eleventh Amendment equally bars Salvato's takings claim, *see Bay Point Props. v. Miss. Transp. Comm'n*, 937 F.3d 454 (5th Cir. 2019) and *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209 (10th Cir. 2019), and further, Plaintiff's reliance on 42 U.S.C. § 1983, as a vehicle for her claims, is inappropriate because the State is not a person under § 1983. (*Id.* at 21.)

While I agree that sovereign immunity ordinarily bars a plaintiff from using a lawsuit in federal court to seek money damages from state officials out of the general fund of the state government, *see Edelman*, 415 U.S. at 665–67, the Eleventh Amendment is no bar to the claims against Harris, here, insofar as Plaintiff's claims only request the return of her and the class's <u>own property</u>.  Because neither party provided, nor could the Court unearth, any legally or factually analogous cases from this circuit, I find the Ninth Circuit's decision in *Taylor v. Westly*, 402 F.3d 924, 930-35 (9th Cir. 2005), persuasive and informative.

In *Taylor*, two individuals filed suit after the State of California Controller escheated purportedly unclaimed shares of stock that the individuals had owned, before selling the stock and depositing the proceeds into the state's general fund. 402 F.3d at 926. Like here, the plaintiffs claimed that the notice provided to them was not constitutionally adequate. The district court dismissed the complaint under the Eleventh Amendment for lack of jurisdiction; however, the Ninth Circuit reversed. *Id.* at 936. The Ninth Circuit found that the suit was not barred by the Eleventh Amendment, because the plaintiffs' claims sought return of their own property. *Id.* at 934-35. In that regard, the appellate panel applied the sovereign immunity framework established in *Malone v. Bowdoin*, 369 U.S. 643, 647 (1962):

> [A] plaintiff['s] ... claim for return of his property [will not be barred by state sovereign immunity] ... if the claim falls into one of two categories: (1) it must be based on the public official having acted beyond his statutory authority (the "ultra

vires exception") or (2) the plaintiff's theory must be that the action leading to the government's possession of the property was constitutionally infirm.

*Id.* at 933 (noting that the plaintiffs "seek return of their own property, rather than to gain ownership of government property," "allege actions that would fall outside the scope of the Controller's statutory authority to such an extent as to be ultra vires," and "California did not and could not authorize its officer to take people's property without notice and in the absence of any connection to the State of California."). Specifically, the appellate panel explained that California's unclaimed property laws distinguish between "escheated property" and "permanently escheated property."[4] Critically, the Ninth Circuit reasoned that where the property has not "permanently" escheated to the state, California's Unclaimed Property Law establishes a "custodial escheat system." The court stressed that, in accordance with California's unclaimed property laws, the Controller must "safeguard and conserve" unclaimed property in a trust fund for the interests of all parties having an interest in the property. Thus, the *Taylor* court, which likened escheated property to a car that is towed and held in an impound lot for its rightful owner, concluded that to the extent the funds "remained in the state's special account, they were being held in trust, rather than being in the state treasury."  Stated simply, "money that the state holds in custody for the benefit of private individuals is not the state's money, any more than towed cars are the state's cars." *Id.* at 932.

---

[4]     Permanent escheatment occurs only after the Controller files suit in California Superior Court, publishes repeated notice in newspapers, and receives a judgment establishing that title has passed to the state. 402 F.3d at 931-32. But even that judgment does not establish "permanent" escheat. Rather, the escheat becomes "permanent" only "[u]pon the expiration of five years after the date of entry of the judgment." *Id.* Notably, in New Jersey, the UPA does not distinguish between escheat and "permanent" escheat. Rather, as stated throughout this Opinion, the UPA allows a person to "make a claim to the property at any time in perpetuity." *Clymer v. Summit Bancorp.*, 171 N.J. 57, 63 (2002) (citing N.J.S.A. 46:30B–77.) Thus, the UPA provides for a true custodial escheat.

Here, the parallels between California's unclaimed property laws and the UPA are plainly evident—and acknowledged by Defendant. First, it is well established that like California, the UPA provides for custodial escheat as opposed to absolute escheat. *American Express Travel Related Services Co*., 755 F. Supp. 2d at 565 ("the purpose of enacting these escheat laws is to provide for the safekeeping of abandoned property and then reunite the abandoned property with its owner"). That is, "when [the abandon property is] turned over [to] the State, the rightful owner may file a claim to recover the property <u>at any time</u>." *Id.* (emphasis added); *see* N.J.S.A. 46:30B-77. This distinction was explained in *Commonwealth of Penna. v. Kervick*, 114 N.J. Super. 1, 8 (Ch. Div. 1971), *rev'd on other grounds* 60 N.J. 289 (1972):

> Escheat in New Jersey derives from the right of the sovereignty of the State "as the original and ultimate proprietor" of all property within its jurisdiction. The purpose of all escheat laws is not only to enrich the State but to put into active use funds that are unclaimed and lying dormant. Yet, escheat statutes should be distinguished from custodial statutes which make the State a custodian of the abandoned property, subject to delivery to those who prove ownership or a right to possession. The Custodial Escheat Act of 1951 amended the prior Absolute Escheat Act of 1946 to add an alternative method of escheat, using an intermediate custodial procedure.

Indeed, Defendant concedes this point, stating that when property is transferred to the State under the auspices of the UPA, the "funds [are held] <u>in perpetuity for the true owner</u>[.]" (Def. Mov. Br., 38) (emphasis added).

Second, the mechanics of the UPA, specifically the placement of collected abandoned funds in a separate trust account, confirms the custodial nature of New Jersey's unclaimed property laws. As admitted by Defendant, most collected funds are placed in the Unclaimed Personal Property Trust Fund, with certain limited types of funds, such as abandoned child support and unclaimed property deposits from electric and gas utilities, placed in other funds, and invested by the Treasurer. N.J.S.A. 46:30B-74 and -75. Unless the Administrator deems it "prudent and advisable," 75% of all funds received are transferred to the State's General Fund. N.J.S.A. 46:30B-

11

74. The remaining portion, however, is "retained in the trust fund, administered and invested by the State Treasurer, and used to pay claims duly presented and allowed and all expenses and costs incurred by the State of New Jersey." N.J.S.A. 46:30B-74(c). Thus, although the Legislature still must appropriate from the Unclaimed Personal Property Trust Fund to administer the act and pay claims, "all unclaimed funds are held by the Treasurer as trustee for the public interest." *Clymer*, 171 N.J. at 63.

Tellingly, Defendant cites only one case from the unique universe of unclaimed property law to support its Eleventh Amendment position. And, although Defendant is correct that the court in *Arnett v. Strayhorn*, 515 F. Supp. 2d 690, 695 (W.D. Tex. 2006), ultimately found that the defendant was entitled to the protection of the Eleventh Amendment, Defendant overlooks its reasoning. In *Strayhorn*, the plaintiff, in his capacity as administrator for an estate, requested the return of $51,550.00, plus the interest thereon. *Id.* at 693. The property had been held in trust by the State of Texas, resulting from previously unclaimed 50,000 shares of stock. *Id.* Although the State of Texas returned the $51,550.00, the plaintiff never received the interest that had accrued. *Id.* The district court acknowledged the Ninth Circuit's decision in *Taylor*, but it distinguished Texas's unclaimed property law from its counterpart in California. *Id.* at 695. The *Arnett* court explained that while California's Unclaimed Property Law signals, by using "[t]raditional trust language," that the Controller holds property he or she takes as unclaimed in "trust" for the rightful owner, "the Texas statute directs the Comptroller to deposit unclaimed property in the State's general revenue fund, not in a separate trust fund for owners." *Id.* at 696. In fact, the Texas statute makes clear that the escheated property is held in trust for the benefit of the State, not for the benefit of the owner. *Clark v. Strayhorn*, 184 S.W.3d 906, 912 (Tex. App. 2006). As described above, that is simply not the case with New Jersey's UPA. Accordingly, I find that the Eleventh

Amendment does not bar Plaintiff's claims for return of her own property under the UPA, because such claims are not for "damages" against the State.[5]

### 2. *Burford Abstention Doctrine*

As to the *Burford* abstention doctrine, Defendant urges the Court to abstain from hearing the instant suit because timely state court review of Plaintiff's claims is available, and the Complaint challenges central components of New Jersey's policy with regard to abandoned property. (Def. Moving Br., 28-31.) Defendant stresses that the New Jersey statute provides "both a clear state administrative and court path." (*Id.* at 28.) According to Defendant, if Plaintiff files a claim that is denied, either in whole or in part, she may then file an appeal with the Superior Court, Appellate Division pursuant to N.J.S.A. 46:30B-84.  (*Id.*) Defendant explains that Plaintiff began this process by filing a claim; however, she later abandoned the process.

*Burford* abstention "calls for a two-step analysis." *Riley v. Simmons*, 45 F.3d 764, 771 (3d Cir. 1995) (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989)). The first question is whether "timely and adequate state-court review" is available. *Id.* If such review is available, the district court next considers whether the case (1) implicates a

---

[5]     Moreover, the Court finds that Plaintiff has standing to bring this lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (finding that to bring suit in federal court, a plaintiff must have suffered an "injury in fact," establish a causal connection between the injury and the defendant's conduct, and show a likelihood that the injury will be "redressed by a favorable decision"). Here, Plaintiff has shown standing for both retrospective and prospective relief. *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 185 (2000) (finding that "a plaintiff must demonstrate standing separately for each form of relief sought"). As for prospective relief, Plaintiff seeks, *inter alia*, injunctive relief, requiring Defendant to return her property, which she alleges Defendant seized without notice and without authority under the UPA. Even if the physical shares cannot be returned, the proceeds from the sale of the shares would nonetheless constitute sufficient redress for the harm alleged. *See Suever v. Connell*, 579 F.3d 1047, 1059 (9th Cir. 2009) (noting that the Eleventh Amendment is no bar to the plaintiffs' claims for return of their escheated principal "and the sales proceeds therefrom"). As such, the Court finds no merit in Defendant's argument that Plaintiff's claims fail because the State is not a person under § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64, 70–71 (1989) (holding that term "person" in § 1983 includes state officers in their official capacity only if the officers are sued for prospective injunctive relief); *Malacow v. Thompson*, No. 20-11742, 2020 WL 7711138, at *2 (D.N.J. Dec. 29, 2020) ("A plaintiff may bring claims for prospective injunctive relief against state actors in their official capacities under 42 U.S.C. § 1983.").

regulatory scheme that "involves a matter of substantial public concern;" (2) "whether it is the sort of complex, technical regulatory scheme to which the *Burford* abstention doctrine usually is applied;" and (3) "whether federal review of a party's claims would interfere with the state's efforts to establish and maintain a coherent regulatory policy." *Chiropractic Am. v. Lavecchia*, 180 F.3d 99, 105 (3d Cir. 1999) (internal quotation marks omitted). Importantly, however, to trigger *Burford* abstention, an action must challenge a state's regulatory scheme, <u>rather than actions taken under color of the scheme</u>. *Culinary Serv. of Delaware Valley, Inc. v. Borough of Yardley, Pa*, 385 F. App'x 135, 144 (3d Cir. 2010); *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 409-10 (3d Cir. 2005).

Here, because Plaintiff is challenging Defendant's actions in connection with the UPA, not the UPA itself, the *Burford* abstention doctrine is inapplicable. *Borough of Catasauqua v. Darwin Nat. Assur. Co.*, No. 11-03855, 2012 WL 1071224, at *5 (E.D. Pa. Mar. 30, 2012) (finding *Burford* abstention doctrine inapplicable where the plaintiff did not challenge the regulatory scheme applicable to insurers under Pennsylvania law, but rather alleged that the defendant's actions violated the legal rules governing insurance conduct in Pennsylvania); *see also Gov't Emps. Ins. Co. v. Uptown Health Care Mgmt., Inc.*, 945 F. Supp. 2d 284, 290-91 (E.D.N.Y. 2013) (concluding that *Burford* abstention did not apply because the plaintiffs "challenge[d] [the defendant's] fraudulent conduct, rather than New York's regulatory scheme").

B.   <u>Failure to State a Claim</u>

Finding Defendant's procedural and jurisdictional arguments unpersuasive, the Court turns to Defendant's argument that dismissal is nonetheless appropriate under Fed. R. Civ. P. 12(b)(6) because Plaintiff fails to state a due process or takings claim.[6]

---

[6]    Notably, the Supreme Court and the Third Circuit have recognized that "the constitutionality of current state escheat laws is a question that may merit review in a future case." *Taylor v. Yee*, 136 S. Ct.

### 1. *Due Process Violation*

First, Defendant contends that Plaintiff cannot show the remittance and custodial holding of her stock rises to a due process violation. Defendant argues that (1) Plaintiff's private interests are miniscule, (2) the Complaint fails to identify any proposed "additional required procedure" that the custodians of her property failed to follow, and (3) case law suggests a substantial public interest exists in abandoned property. (Def. Moving Br., 36-40.)  I disagree.

The Fourteenth Amendment provides, in pertinent part, that the State may not "deprive any person of life, liberty, or property, without due process of law[.]" The "due process of law" essentially requires that "the government provide a person notice and opportunity to be heard in connection with the deprivation of life, liberty or property." *Belton v. Singer*, No. 10-6462, 2011 WL 2690595, at *13 (D.N.J. July 8, 2011) (citing *Zappan v. Pennsylvania Board of Probation and Parole*, 152 Fed. Appx. 211, 220 (3d Cir. 2005)) ("The essential requirements of any procedural due process claim are notice and the opportunity to be heard."). Hence, to establish a *prima facie* case of a procedural due process violation, a plaintiff must establish: (1) a deprivation of a constitutionally protected liberty or property interest, (2) state action, and (3) constitutionally

---

929, 930 (2016) (Alito, J., joined by Thomas, J., concurring in the denial of *certiorari*) (discussing a challenge to California's procedure for notifying property owners); *Marathon Petroleum Corp. v. Sec'y of Fin. for Delaware*, 876 F.3d 481, 488 (3d Cir. 2017) (noting that in recent years, state escheat laws have come under assault for being exploited to raise revenue rather than to safeguard abandoned property for the benefit of its owners) (internal quotations omitted) (citation omitted).  In *Taylor v. Yee*, Justice Alito wrote:

> This trend—combining shortened escheat periods with minimal notification procedures—raises important due process concerns. As advances in technology make it easier and easier to identify and locate property owners, <u>many States appear to be doing less and less to meet their constitutional obligation to provide adequate notice before escheating private property</u>. Cash-strapped States undoubtedly have a real interest in taking advantage of truly abandoned property to shore up state budgets. But they also have an obligation to return property when its owner can be located. To do that, States must employ notification procedures designed to provide the pre-escheat notice the Constitution requires.

*Id.* (emphasis added).

inadequate process. *See Rusnak v. Williams*, 44 Fed. Appx. 555, 558 (3d Cir. 2002) ("Procedural due process claims, to be valid, must allege state sponsored-deprivation of a protected interest in life, liberty or property. If such an interest has been or will be deprived, procedural due process requires that the governmental unit provide the individual with notice and a reasonable opportunity to be heard.") (citation omitted). To have a property interest, Plaintiff must demonstrate "more than an abstract need or desire for it.... [She] must, instead, have a legitimate claim of entitlement to it" under state or federal law. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). "For present purposes, a procedural due process analysis involves a two-step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property interest within the contemplation of the Due Process clause of which he has been deprived and, if so, the second question is whether the process afforded the complaining party to deprive him of that interest comported with constitutional requirements." *Harris v. Christie*, 10-2402, 2010 WL 2723140, at *10 (D.N.J. July 7, 2010) (citing *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000)).

Here, assuming the allegations of the Complaint to be true, I find that Plaintiff plausibly alleges a violation of her Fourteenth Amendment due process rights. First, it appears undisputed that Plaintiff suffered a deprivation of a property interest because of state action. Indeed, Defendant does not contest that following receipt of an unclaimed property report from Alseres, the Administration seized forty shares of Plaintiff's stock which it believed to be abandoned. Further, Defendant does not dispute that those forty shares of stock were later sold.

As for the third and final element, whether Plaintiff received constitutionally adequate process, Plaintiff alleges that, despite notifying Alseres of her mother's death, which triggered the transfer of ownership of the stock solely into her name, she neither received notice that her forty shares of the stock were subject to escheatment, nor that they had actually been seized, and

eventually sold, by Defendant. (Compl., ¶ 14.) Rather, Plaintiff claims that she had no reason to

suspect that the stock was seized, because she continued to receive investor e-mails from the holder

years after the stock had been escheated. (*Id.* at ¶ 15.) Further, she claims to have only learned that

the stock had been escheated years later, when she received a phone call from Defendant's office

asking to speak with her deceased mother. (*Id.* at ¶ 15.) According to Plaintiff, it was at that time

that Defendant explained that the stock had been sold and that the forty shares were only worth

about $3.00 in total. (*Id.* at ¶ 16.) This appears to be the crux of Plaintiff's case. Contrary to

Defendant's representations on this motion, Plaintiff alleges that Defendant sold the shares on a

day when the value of the stock "fluctuated between $300 to $500 per share," and therefore, the

State received somewhere between $12,000 and $20,000 in connection with the sale—a far cry

from $3.00.

Indeed, with respect to notice, the UPA distinguishes between property valued more than

$100 and property valued less than $100:

> The administrator shall cause a notice to be published not later than November 30
> of the year next following the year in which abandoned property has been paid or
> delivered to the administrator, or in the case of property reported by life insurance
> companies, September 1, of the year in which abandoned property has been paid or
> delivered to the administrator following the report required by Article 17 of this
> chapter at least once a week for two consecutive weeks in a newspaper of general
> circulation in the county of this State in which is located the last known address of
> any person to be named in the notice. If the address is outside this State, the notice
> shall be published in the county in which the holder of the property has its principal
> place of business within this State.
>
> <u>The administrator is not required to advertise the name and address or location of
> an owner of property having a total value of less than $100</u>.

N.J.S.A. 46:30B-51 (emphasis added). To the extent that Defendant argues, on this motion to

dismiss, that the lack of notice provided to Plaintiff was appropriate based on the value of the

stocks seized or, in other words, the value of Plaintiff's stock was so "miniscule" that it did not

require the notice described in N.J.S.A. 46:30B-51, that is a factual dispute that cannot be resolved at this stage of the litigation. To resolve this critical question, and ultimately determine whether the lack of notice given to Plaintiff was reasonable under the circumstances, factual issues, *inter alia*, regarding the final sale price, the date the property was escheated, and the value at the time of seizure by the State must be resolved. *See Dani v. Miller*, 374 P.3d 779, 798 (O.K. 2016) (finding no due process violation where Oklahoma's unclaimed property statute requires notice to property owners via "multiple mechanisms that are reasonably calculated, under the circumstances, to apprise interested parties that their abandoned property is (or is soon to be) in the custody of the State and that they may file a claim to have it returned to them"); *Am. Petrofina Co. of Texas v. Nance*, 697 F. Supp. 1183, 1190 (W.D. Okla. 1986), *aff'd*, 859 F.2d 840 (10th Cir. 1988) (finding that Oklahoma's unclaimed property statute did not violate the plaintiff's due process rights where the statute did not require notice to owners preceding and regarding the transfer to the State of their property valued at less than $50 dollars); *Taylor v. Chiang*, S-01-2407, 2012 WL 12842783, at *1 (E.D. Cal. Nov. 16, 2012) (dismissing the plaintiff's due process clause claim based on a finding that the U.S. Constitution does not require the Controller to provide any more notice than already contemplated by the statute to the apparent owners of unclaimed property valued at less than $50). Accordingly, Plaintiff's due process challenge is not a pure question of law, but rather depends on a determination of facts not yet developed.[7] Because this factual issue,

---

[7]         I note that Defendant attaches certain documents to the Certification of Steven Harris in Support of his Motion to Dismiss, including the unclaimed property report filed by Alseres dated July 22, 2010; documents allegedly confirming the value of Plaintiff's stock and the date of sale associated with the stock; and documents in connection with Plaintiff's filed claim with the Unclaimed Property Administration. On a motion to dismiss, a court generally does not consider documents extraneous to the pleadings, but may consider a "document integral to or explicitly relied upon in the complaint ... without converting the motion to dismiss into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted).  Here, none of these documents are explicitly referenced in the Complaint, nor do these documents represent the entire universe of documents necessary to ultimately resolve the underlying claims. While the Court appreciates that these documents may be integral to

however, is a seminal issue in this case, and it can be resolved in relatively short order, the parties are directed to conduct expedited discovery within thirty days as it relates to the value of Plaintiff's property at the time of escheatment, the date of sale of the property, and the total sale price. If the facts demonstrate a minimal value of the property, i.e., less than $100.00 as set forth in the statute, Defendant may move for summary judgment on this issue. Defendant's motion to dismiss Plaintiff's Fourteenth Amendment due process claim is denied.

### 2. Takings Claim

Next, I turn to Plaintiff's takings claim. Relying on *Texaco, Inc. v. Short*, 454 U.S. 516, 526 (1982) and *Simon v. Weissman*, 301 F. App'x 107 (3d Cir. 2008), Defendant maintains that courts have routinely found that a custodial escheat and handling of abandoned property do not create an actionable taking, and that alleged takings of money do not lend themselves to constitutional analysis. (Def. Moving Br., 4.) Defendant's argument, however, overlooks an important distinction between those cases and this matter.

In *Texaco*, the Court ruled on the constitutionality of an Indiana statute mandating the reversion of mineral rights from their owner to the surface owner if the mineral rights had not been used for twenty years. *Id.* at 530. The Court affirmed the validity of the statute against challenges under both the Due Process and Takings Clauses, and approved Indiana's right to treat the mineral interests as abandoned if not utilized within a certain period. *Id.* In doing so, the Court ruled that the state did not to have pay for the owner's neglect:

> In ruling that private property may be deemed to be abandoned and to lapse upon the failure of its owner to take reasonable actions imposed by law, this Court has never required the State to compensate the owner for the consequences of his own neglect.... It is the owner's failure to make any use of the property—and not the action of the State—that causes the lapse of the property right; there is no "taking" that requires compensation.

Defendant's defense of this suit, Plaintiff is entitled to the benefit of discovery. However, I am ordering expedited discovery.

*Id.* More than twenty-five years later, in *Simon*, the Third Circuit considered whether certain provisions of Pennsylvania's unclaimed property statute, relieving the State from having to pay underline interest earned on unclaimed property, imposed a taking for which just compensation must be paid, pursuant to the Fifth and Fourteenth Amendments of the U.S. Constitution. 301 F. App'x at 109. There, the appellant was the rightful owner of 300 shares of common stock. *Id.* In July 2002, however, the stocks were presumed abandoned and transferred to the Commonwealth of Pennsylvania. *Id.* After receipt, the Commonwealth liquidated the 300 shares with a per share sale price of $2.01. *Id.* In August 2003, the appellant learned of the confiscation of his stock and filed a claim for his property, which the Commonwealth processed, paying him $586.47 in January 2004. *Id.* The Commonwealth refused to pay the appellant any of the interest earned by the Commonwealth on the proceeds of the stock sale, which the plaintiff estimated as approximately $30. *Id.* Applying the same logic as *Texaco*, the *Simon* Court found no Takings Clause violation when unclaimed property statutes allow States to retain interest earned on abandoned property while in state custody. *Id.* at 113. Specifically, the Third Circuit found that "[j]ust as in *Texaco*, where the owner's failure to use the mineral rights within a certain, statutorily-defined period caused abandonment of those rights, the plaintiffs here let their property interest lapse after the time prescribed by [Pennsylvania's Disposition of Abandoned and Unclaimed Property Act]." *Id.* at 112. Thus, the appellate court found that "under the rationale of *Texaco*, the Commonwealth of Pennsylvania has no obligation to pay interest on property which plaintiffs abandoned." *Id.*

This case, however, does not concern Plaintiff's recoupment of interest[8] in connection with what was abandoned and properly escheated property, but rather Defendant's alleged unlawful

---

[8]      In *Simon*, the Third Circuit agreed with the district court's finding below that dividends accruing on stock held by the state pursuant to unclaimed property laws "may not be taken by the state without just compensation to the owner." *Simon*, 301 F. App'x at 113 (quoting *Canel v. Topinka*, 212 Ill.2d 311, 288

taking of Plaintiff's principal property. And, more importantly, a question remains as to whether Plaintiff's property was abandoned and properly escheated in the first instance; indeed, Plaintiff alleges that her identity and whereabouts were known at the time of escheatment and that Defendant acted outside the scope of the UPA by seizing her property without constitutionally sufficient notice. In fact, in discounting the appellant's position that the Commonwealth's withholding of interest amounted to a taking, the *Simon* Court emphasized that the cases relied on by the appellants "primarily […] involve, in our opinion, a fundamentally different property status[,]" because the property was not deemed abandoned. *Simon*, 301 F. App'x at 112. Specifically, the Third Circuit noted that in each case relied on by the appellants, "the identity of the rightful owner of the property was known and identifiable, and the money was not deemed abandoned." *Id.* Unlike in this case, in *Simon*, the property was presumed by statute to be abandoned, with the identity and/or whereabouts of the property owner unknown during the time the Commonwealth possessed the property. *Id.* Accordingly, I find that, as a threshold matter, Plaintiff's allegations could give rise to a takings claim.

Nonetheless, I must first ensure that such a claim is ripe for consideration—an issue that neither party raised. *Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 535 (3d Cir. 1988) (finding that "considerations of ripeness are sufficiently important that [courts] are required to raise the issue *sua sponte* even though the parties do not"). Generally speaking, the takings clause prohibits states from taking private property for public use without just compensation. U.S. Const. amend. V, XIV. To succeed on a takings claim, plaintiff must first show that the state's action affected a "legally cognizable property interest." *Am. Exp. Travel Related Servs., Inc. v. Sidamon–*

---

Ill.Dec. 623, 818 N.E.2d 311, 326 (2004)). The appellate court explained that "[o]ur case addresses only the issue of interest earned on cash," noting that the appellant had not "convinced us that interest on cash should be treated exactly the same as dividends on negotiable instruments such as stock." *Id.*

*Eristoff*, 669 F.3d 359, 371 (3d Cir. 2012) (quoting *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004)). That is not the only inquiry, however.

"[T]he Fifth Amendment bars not just the taking of property, but the taking of property without just compensation, [and] a plaintiff cannot claim a violation of the Just Compensation Clause until he or she has exhausted a state's procedure for seeking just compensation." *Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 168 (3d Cir. 2006). Indeed, the Takings Clause is "designed not to limit the governmental interference with property *per se*, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *CBS Outdoor Inc. v. New Jersey Transit Corp.*, No. 06-2428, 2007 WL 2509633, at *9-10 (D.N.J. Aug. 30, 2007), *aff'd sub nom. Carole Media LLC v. New Jersey Transit Corp.*, 550 F.3d 302 (3d Cir. 2008) (citing *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005)). In reviewing whether an as-applied Fifth Amendment just compensation takings claim is ripe, such is the case here, the Supreme Court requires that: (1) a final decision must be reached regarding the property ("finality prong"); and (2) the plaintiff must have exhausted state just compensation procedures ("exhaustion prong"). *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985). The finality prong considers whether a "definitive position" has been made that may inflict the property owner with deprivation, while the exhaustion requirement allows for an injured party to seek a forum to "review...an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Id.* at 193.[9] So long as a reasonable provision exists at the time of the taking to obtain just compensation, an aggrieved party must exhaust those procedures. *Id.* at 194.

---

[9]     The Court notes that *Williamson*'s finality prong does not apply to a facial attack on an ordinance or statute. S*ee County Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159 (3d Cir. 2006) (finding that "[f]acial challenges to regulations are generally ripe the moment the challenged regulation or ordinance is passed, but face an uphill battle, since it is difficult to demonstrate that mere enactment of a piece of legislation deprived [the owner] of economically viable use of his property.").

The UPA provides a clear mechanism for Plaintiff to receive just compensation for the property purportedly escheated. Specifically, N.J.S.A. 46:30B-77 provides that a "person, excluding another state, claiming an interest in any property paid or delivered to the administrator may file with the administrator a claim on a form prescribed by the administrator and verified by the claimant." That same provision also provides specific requirements for persons asserting claims of entitlement as heirs to the property of an intestate decedent paid or delivered to the administrator, including but not limited to credible evidence of heirship and satisfactory evidence that a diligent investigation to locate all heirs of the decedent was concluded. Once filed, the administrator must consider each claim within 120 days or, in the case of a claim of a person asserting an entitlement as an heir to the property of an intestate decedent, within 120 days of the claimant's submission of the required materials set forth in N.J.S.A. 46:30B-77(b). N.J.S.A. 46:30B-78. If the claim is denied, in whole or in part, the administrator provides written notice to the claimant. *Id.* The claimant is then entitled to appeal the administrator's final decision to the Appellate Division of the Superior Court of New Jersey. N.J.S.A. 46:30B-84. On the other hand, if the claim is successful, the administrator is directed by N.J.S.A. 46:30B-79 to "pay over or deliver to the claimant the property or the amount the administrator actually received or the net proceeds if it has been sold by the administrator, together with any additional amount required by Article 21 of this chapter."[10] Further, when the claim is for stock or other interests in business associations which were sold by the administrator within one year after the date of delivery, the amount payable for that claim is the net proceeds of sale. *Id.*

Here, the Complaint includes no allegations regarding the UPA claim process. Indeed, Plaintiff does not allege what steps she took, if any, following her realization that her shares of

---

[10]     This includes dividends, interest, or other increments realized or accruing on the property at or before liquidation or conversion thereof into money. N.J.S.A. 46:30B-68.

Alseres stock had purportedly been escheated and sold. Instead, the Complaint merely alleges that Plaintiff was "subsequently unsuccessful in seeking return of her property pursuant to the post-deprivation procedures." (Compl., ¶ 14.) She does not, however, allege that she ever filed a claim for the return of her property, let alone that her petition was actually received by Defendant, considered, denied, and that she exhausted her appellate rights in the Appellate Division of the Superior Court of New Jersey.[11] Accordingly, since Plaintiff does not allege that she has exhausted state just compensation procedures, she cannot show a denial of just compensation, and therefore, her taking claim is not ripe for federal adjudication. Failure to meet the exhaustion prong precludes the finality prong of the Takings Clause. *See Miles v. Twp. of Barnegat*, No. 05-1661, 2008 WL 89910, at *4 (D.N.J. Jan. 7, 2008), *aff'd*, 343 F. App'x 841 (3d Cir. 2009).

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendant's motion to dismiss is **GRANTED** in part and **DENIED** in part. Plaintiff's claim for violation of the Takings Clause of the Fifth Amendment under 42 U.S.C. § 1983 is dismissed without prejudice because the Complaint fails to allege exhaustion of the UPA's claim procedure. Plaintiff is given leave to amend her Complaint within 30 days of the Order accompanying this Opinion, so long as she can allege that she has exhausted all state just compensation procedures under the UPA. Defendant's motion to dismiss Plaintiff's claim for violation of her Fourteenth Amendment due process rights under 42 U.S.C. § 1983 is denied; however, the parties are directed to conduct expedited discovery within thirty days as it relates to the value of Plaintiff's property at the time of escheatment, the date of sale of the property, and the total sale price.

---

[11]   Defendant asserts that in July 2019, Plaintiff filed a claim with the Unclaimed Property Administration, but that she did not complete the process and thus abandoned the claim. *See* Harris Cert. at Exh. D. Further, Defendant claims that Plaintiff did not appeal any perceived claim denial to the New Jersey Appellate Division pursuant to N.J.S.A. 46:30B-84. *See* Harris Cert. at ¶ 11.

Dated: April 26, 2022

/s/ Freda L. Wolfson
Freda L. Wolfson
U.S. Chief District Judge